**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00539-TSC** |
| **v.** | : | |
| | : | |
| **NICHOLAS J PERRETTA** and | : | |
| **MITCHELL PAUL VUKICH,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S AMENDED SENTENCING MEMORANDUM**
**AS TO MITCHELL PAUL VUKICH**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Mitchell Paul Vukich to one month incarceration and $500 in restitution.

This memorandum has been amended to correct attribution in certain text messages between the defendants.

I.    **Introduction**

The defendant participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

The defendant has pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  The government recognizes that the defendant did not personally engage in violence or property destruction and that he accepted responsibility. However, as explained herein, a jail sentence of one month is appropriate in this case because the

defendant breached the U.S. Capitol after witnessing assaults on law enforcement; the defendant entered all the way to the 3rd floor of the Capitol building where few other rioters ventured and where many staff offices are located; the defendant stole paperwork that was on the floor of a hallway;[1] and the defendant made statements suggesting a lack of remorse.

The Court must consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification and the potential for future violence renders a jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 35, 38 (Statements of Offense). As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

---

[1] Perretta described the papers he picked up as "three-month-old congressional papers".  Vukich described the papers he picked up as "session agenda notes."  Both confirmed they threw the papers away.

*Perretta and Vukich's Role in the January 6, 2021 Attack on the Capitol*

Perretta and Vukich traveled to Washington D.C. to attend the rally organized by former President Trump.  Perretta indicated to the FBI he went to DC because he wanted to "see what was going on," but neither he nor Vukich planned to storm the U.S. Capitol building.

On January 6, 2021, Perretta wore a black hat, black jacket, black surgical mask, dark pants, and yellow eye protection glasses.  Vukich wore a dark t-shirt, blue jacket, khaki pants, and plastic goggles.  While former President Trump was speaking, the defendants began walking together toward the Capitol building.

Upon arriving at the Capitol grounds, the defendants observed the crowd pressing forward into the building.  They witnessed individuals bypassing barriers and police officers.  They witnessed flashbangs and tear gas.  The defendants admitted in their respective plea agreements that they witnessed at least one officer assault which they claimed was 50 yards away; however, as outlined below, the evidence suggests both defendants were in much closer proximity to the violence.



(*Photo of Perretta on Jan 6. on Capitol grounds captured by Vukich's phone*)

Despite all this, the defendants moved to the front of the crowd and entered the U.S. Capitol building on the west side.  Google location data shows a device associated with Vukich was detected at 7 different points within or near the Capitol building from approximately 2:11pm until 2:36pm EST (~25 minutes).



Video of the defendants was then captured in multiple hallways within the Capitol by CCTV. They are seen walking together and appear visibly animated about the breach.





In the screen grabs below from CCTV video, the defendant Vukich can be seen opening cupboards and both defendants pick up papers off the floor.



*(Defendant Vukich is seen opening a cupboard.)*



*(Both defendants stoop down at the same time and each pick up papers from the floor.)*



*(Vukich places the papers in his jacket. Perretta is seen looking through papers from the floor.)*

*Perretta Messages*: In the afternoon of January 6, 2021, Perretta texted someone from his phone: "We broke into the capital".  The person responded, "Pics or u cappin".  Perretta responded, "Swear on everything" and included the picture below which shows Vukich in the lower right corner.



This person responded, "Okay you passed the first test" "The 2nd test is you gotta steal something".  Later the individual texted, "Nick delete my steal something message, I dont wanna go to jail with you".

Later in the evening Perretta texted the same individual, "Shit was wild, got tear gassed in the capital", "We smoked a blunt in the capital", and "We were on the 3rd floor".  The

individual texted in response, "Dont get shot like that bitch".  Perretta responded: "We easily

could've" "We were getting flashbangs thrown at us too".

      *Vukich Messages*:  Vukich also sent a series of text messages to individuals regarding the

riot making the following statements:

- "Bro I was in the capitol building I almost got shot"
- "Bro I was in the first 15 people in the capitol"
- "Crazy stuff we were in the thick of it"
- "Today was wild"
- "I just wanted to see history firsthand"
- "A girl got shot so we're leaving"
- "We were in the thick of it I had my goggles"
- "I just stormed the capitol but I'm out now"
- "Got pepper sprayed and shot with rubber bullets lol"

Below is a screenshot of Vukich's phone showing a text message exchange with an individual

where he discusses the breach and sends a selfie.



On his Twitter profile, on January 6th Vukich posted the following:

- "I was the first in, first out"
- "Police were using mace, flash bangs, rubber bullets"
- "I was one of the first 15 people in the #Capitol. Wild stuff. Be safe out there."

*Vukich's FBI Interview*

Vukich voluntarily agreed to an interview with the FBI on April 26, 2021.  During that interview Vukich claimed he attended the rally on January 6th with no intention of entering the Capitol, but he also admitted that he did enter the Capitol building through an already open door. Vukich indicated he and Perretta walked around the building for approximately 15 minutes. Vukich reported that when officers ordered him to leave, he and Perretta obeyed.  When asked if he understood that it was illegal to enter and remain within the Capitol building, Vukich stated he now knew it was. However, he claimed he did not know it was illegal at the time of the incident.

When Vukich was show a photograph of him placing papers inside his jacket, he confirmed that he was the person in the photo and that he took the papers as a "souvenir" but later threw them away in an unknown trashcan.  Vukich described the papers as "session agenda notes."

*Perretta's FBI Interview*

Perretta later voluntarily agreed to an interview with the FBI on June 8, 2021.  Perretta confirmed that he went to the rally and marched on the Capitol building.  Perretta indicated that he observed four barricades and two officers between the crowd and the Capitol.  Perretta stated that he was behind a crowd of "maybe" ANTIFA and Proud Boys.  Perretta stated to the FBI that he saw flashbangs and tear gas deployed and saw someone push an officer down before walking up the steps of the Capitol.  Perretta confirmed that they entered the Capitol building through an

already open door.  Perretta stated that he himself was tear gassed and therefore, once inside the

Capitol went into one of the bathrooms to "clean himself up".  Perretta denied bringing the

papers or anything else from the Capitol.  Perretta described the papers he picked up as "three-

month-old congressional papers" which they threw away outside.

When asked why Vukich wore goggles, Perretta related that Vukich told him he had an

odd feeling that "something might happen" at the Capitol.  Perretta stated that his own yellow

glasses did not protect him from the tear gas.  Perretta then stated he believed the Capitol was

open to the general public.

*Perretta and Vukich's Text Exchange*

After Perretta's interview with the FBI, Perretta contacted Vukich via text message and

had the following exchange (errors in original):

- Perretta: "You know who stopped at my house"
- Vukich: "Fack they just ask questions"
- Perretta: "Yeah, didn't say if I was gonna get arrested or not"
- Vukich: "What did you tell them"
  …
- Perretta: "I was talking to em for like 30 mins"
- Vukich: "You should've said fuxk off I want my lawyer"
  …
- Perretta: "I thought about it honestly"
  …
- Vukich: What did they ask you"
  …
- Perretta: "Asked about how that day went" "The papers. Showed me the pictures of us inside" "I told em you threw that paper away when you got outside" "I couldn't have made it anymore clear that we aren't trump supporters, proud boys, qanon or anything like that"
  …
- Vukich: "Don't say nothing if they come knocking agaim"
- Perretta: "Fucking asshole wanted my Twitter" "Not like there is anything on it but still"
- Vukich: "Yeah they already have it bud lol"
  …
- Vukich: "There's been over 500 people charged, we will fight this no jail for us"
- Perretta: "Exactly" "I just can't see us getting in trouble"

*The Charges and Plea Agreement*

On June 21, 2021, Perretta and Vukich were charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 15, 2021, they both pleaded guilty to Count One of the Information, charging both defendants with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, the defendants agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

The defendants now face sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendants each face up to six months of imprisonment and a fine of up to $5,000. The defendants must also pay restitution under the terms of the plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Vukich was well aware of the jeopardy posed by violent entry into the Capitol by the rioters and was also aware of the violence required to make that entry into the Capitol.  His awareness of this danger is evidence by the fact that sent messages indicating he "almost got shot", that he was one of the first 15 people inside, that he "stormed the capitol", that "Police were using mace, flash bangs, rubber bullets", and that he "Got pepper sprayed and shot with rubber bullets lol".

Vukich claimed the defendants were some of the first inside. Vukich and the others who first breached the U.S. Capitol bear a special responsibility for this unparalleled crime because they emboldened the rioters who came behind them and were therefore each vitally important and thus responsible for the large crowd that overwhelmed the police officers through both violence and also sheer numbers.

Vukich entered the Capitol building at approximately 2:11 p.m. after getting tear gassed. He was inside the Capitol for approximately 20-25 minutes. He did not engage in any violence or destruction.  Once inside the Capitol, Vukich walked through various hallways, making it all the way up to the 3rd floor.  Vukich took what appear to be congressional papers from off the floor and reported throwing them away.  Vukich cooperated with FBI agents when they interviewed him. The defendant has yet to exhibit evidence of remorse, although he accepts responsibility for the conduct set forth in the filed Statement of Offense.

After the FBI interview Vukich, his text messages to Perretta demonstrate a total lack of remorse: "You should've said fuxk off I want my lawyer"; "Don't say nothing if they [the FBI] come knocking agaim"; "we will fight this no jail for us."

Finally, Vukich admitted that he threw away the papers he had taken. This was evidence he destroyed after the riot.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of the Defendant

Vukich's criminal history, as outlined in the PSR, appears consistent with crimes linked to substance abuse.  It also appears he did not serve any prison time on his two convictions.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf.

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Vukich's text messages and his Twitter posts speak to his knowledge, intent, and lack of remorse. Again, *after* the FBI tracked him down and interviewed him Vukich still—incredibly— was under the impression that he wouldn't "get[] in trouble." On Twitter he bragged, "I was one of the first 15 people in the #Capitol. Wild stuff." Likewise, Vukich's destruction of the papers he stole from the building is halting. These facts clearly demonstrate the need for specific deterrence for this defendant.

As of the date of this filing, Vukich has not expressed remorse. The government acknowledges that the defendant accepted responsibility by entering into this plea agreement. On the other hand, the defendant's failure to acknowledge the dangers and violence of January 6, 2021, and his lack of remorse underscore the need for specific deterrence.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[4] Indeed, the government invites the Court to join Judge Lamberth's

---

[3] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement

admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement. After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct falls in the former category.

The defendant has pleaded guilty to Count One of the Information, a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

---

in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long they remained inside, the nature of any statements made (on social media or otherwise), whether they destroyed evidence of participation in the breach, etc.—help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police, prompt acceptance of responsibility, and expressions of genuine remorse.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the 30-day sentencing recommendation the government made for defendants Robert Bauer and Edward Hemenway, who are cousins, and participated together in the January 6, 2021 attack on the United States Capitol. *See United States v. Robert Bauer and Edward Hemenway*, Case No. 21-CR-000049. The main difference to this case is that Bauer and Hemenway have serious criminal histories while Perretta and Vukich do not. However, Bauer and Hemenway both entered the Capitol building despite seeing significant

violence, they remained inside the Capitol for approximately 15 minutes, and they made their way to the Crypt where they observed additional violence before exiting.

The Court may also consider the 30-day sentencing recommendation the government made for defendant Kevin Cordon who had limited criminal history. *See United States v. Kevin F. Cordon*, Case No. 21-CR-277-TNM.  In that case, the defendant witnessed rioters fighting with law enforcement outside the Capitol and persisted in entering anyway.  Cordon entered within 15 minutes of the initial breach at the Senate Wing door by climbing through a broken window dressed in preparation for violence by donning a vest of body armor and a gas mask.  Cordon also broadcasted incendiary language showing his intent in entering the Capitol and justifying the riot, including a statement that "this is just the beginning."

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Vukich to one month incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By: _____

JACOB J. STRAIN
Utah Bar No. 12680
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530