IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :

    :

    :

     v.     :     **Case No. 1:21-cr-00539-TSC**

    :

    :

MITCHELL P. VUKICH     :

## DEFENDANT'S SENTENCING MEMORANDUM

In the days leading up to the certification of the 2020 Electoral College vote count Mitchell Vukich suggested to his friend, Nicholas Perretta, that they travel from Western Pennsylvania to Washington, D.C., to witness the rally in support of Donald Trump and his claim that the election had been stolen.  Mr. Vukich had been concerned about his friend's mental state which had appeared to him to have worsened at that point in the pandemic lockdown.  He was looking for something that could help to lift Mr. Perretta's spirits.  The choice to go to see the rally was unusual in that neither Mr. Vukich, nor Mr. Perretta, had supported Donald Trump.  Neither had voted for him.  Mr. Vukich had been reading reports about the legitimacy of the election results and he did think that the rally had the potential to be an important moment in history.  The two friends agreed to drive to Washington, D.C., on January 6, 2021, and to spend the night at a suburban hotel.

At the rally on the Mall Mr. Vukich and Mr. Perretta essentially stood on the outskirts of the crowd that had gathered in support of Mr. Trump's stolen election claim.  At some point there were numerous shouts from participants in the crowd to move to the U. S. Capitol.  Borne by the curiosity that had brought them to the District of Columbia on that day, the two walked

1

with the crowd toward the Capitol.  At that point they were not expecting the violence that would

ensue that afternoon.

When the crowd had arrived at the Capitol grounds, the scene was chaotic at best.

Individuals within the crowd had various motivations for being there and differing intentions on

what should happen next and what they would do.  In retrospect the intentions and state of mind

of Mitchell Vukich can best be judged by what was captured by video surveillance.

The defense and the government agree in many respects about the considerations in

sentencing Mr. Vukich.  The horrific event at the Capitol on January 6, 2021, is unparalleled in

its history.[1]  It is also axiomatic that each individual prosecuted for involvement in the event

should be sentenced based upon their conduct, not that of others whose conduct was

unconscionable.  In assessing that conduct of the individual the Court

> ". . . should look to a number of critical factors, to include: (1) whether, when,
> how the defendant entered the Capitol building; (2) whether the defendant
> engaged in any violence or incited violence; (3) whether the defendant engaged
> in any acts of destruction; (4) the defendant's reaction to acts of violence or
> destruction; (5) whether during or after the riot, the defendant destroyed any
> evidence; (6) the length of the defendant's time inside of the building, and
> exactly where the defendant traveled; (7) the defendant's statements in person
> or on social media; (8) whether the defendant cooperated with, or ignored, law
> enforcement; and (9) whether the defendant otherwise exhibited evidence of
> remorse or contrition. While these factors are not exhaustive or dispositive,
> they help to place each individual defendant on a spectrum as to their fair and
> just punishment."

Government's Amended Sentencing Memorandum As To Mitchell Paul Vukich, p. 15.  The

defense would add that the Court should also consider Mr. Vukich's motivation for his presence

---

[1]  There was at least one prior attempt to disrupt or halt the certification of the Electoral College vote count.  That
occurred on February 13, 1861.  A mob gathered at the Capitol and attempted to enter the building to stop the
certification of the election of Abraham Lincoln.  The mob's entry to the Capitol was repelled by security forces led
by General Winfield Scott.
    The other incidents of life-threatening violence or property destruction at the Capitol were perpetrated by an
enemy force (the fire of 1814), by small groups with a unified purpose – the shooting carried out by Puerto Rican
separatists in 1954, the bombing attributed to the Weather Underground in 1971, and the bombing by the May 19th
Group in 1983, by a lone individual, or by members of Congress.

at the Capitol and certainly should consider Mr. Vukich's history and characteristics including

what he has done since the date of his criminal conduct.  It is respectfully suggested that a

sentence of one day of incarceration is sufficient, but not greater than necessary, to satisfy the

statutory purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2) in light of these various

considerations.

Mitchell Vukich has just passed his 26th birthday.  He has an undergraduate biology

degree from Utah State University.  He recently began new employment following a months-

long period of being without a job.  He temporarily resides with his father in the house in which

he was raised.  Aside from his job and his father, he spends the great majority of his time with

his paternal grandparents, especially his grandfather, and his girlfriend.  These are the basic facts

about Mitchell Vukich.  There is, of course, more to his story.

He grew up and lives in the small town of New Brighton, Pennsylvania, in the Beaver

Valley northwest of Pittsburgh.  At the town's only high school he was an academic achiever.  In

his senior year he was the recipient of the character award voted on by his coaches and

teammates on the football team.  He was known to volunteer his assistance in parish and

community events.  He went away to college in Logan, Utah, but had to work throughout each

school year in various jobs to support himself and pay his tuition.  At least one of these jobs

involved full-time hours, while he took a full course load.  During his time in college, he drank

before the age of majority and used marijuana.  As a result of both of these activities he had

contacts with the criminal justice system in Logan.  Other than the instant offense he has had no

other arrests.

Mitchell's true character has been on display in the way he has helped his grandparents.

It is more than the various chores he takes on for them.  When Mitchell's grandfather seemed to

have lost the will to live, Mitchell was inspired to buy a non-functioning Volkswagen van, which they could rehab together.  They spent much of their days together during the period of Mitchell's unemployment.  Unfortunately, their work on the van has been disrupted by his grandfather's cancer diagnosis.  Still, when Mitchell is not traveling for work, he is the person who takes his grandfather to his treatments and other medical appointments.  Any incarceration would affect that provision of care.  More important is the concern that his grandfather's time is now brief and that he might not survive any period of incarceration that Mitchell might have to serve.

On November 8, 2021, Mitchell began working for Niagara Bottling, LLC.  The company is based in California and operates 13 bottling plants in the continental United States. Mr. Vukich was hired for the Technical Engineering Division and is assigned to the traveling team.  His duties require him to travel to the various plants for repair and maintenance of the plant equipment.  To date his work week has ranged between 40 and 60 hours.  Mr. Vukich receives his schedule in advance and books his travel through a company app.  Once he has booked his travel itinerary and accommodations, he provides a copy to his Pretrial Services officer.  It is extremely likely that he would lose this employment, if he were to be incarcerated. This would cause serious harm to his ability to gain comparable employment in the foreseeable future following release.

The defense suggestion of a sentence of one day of incarceration is in no way meant to diminish the gravity of the events of January 6th.  Mr. Vukich recognizes that by entering the Capitol on that date he had lent his body to help create a mob.  His foresight of what might occur was of course not predictive of what he witnessed in the end.  The government suggests in its Sentencing Memorandum that post-incident posts suggest a lack of remorse.  The people who

know Mr. Vukich well state in their letters to the Court that Mr. Vukich has demonstrated that he is extremely remorseful that he became part of a mob on January 6th and for what that mob did inside the Capitol.

A consideration of the government's nine factors for placing Mr. Vukich along the spectrum as to fair and justice punishment would indicate that incarceration, or incarceration for more than one day, is not required.  (1) There is no evidence to gainsay Mr. Vukich's statement to the FBI that he and Mr. Perretta entered through a door that already stood open.  (2) The video evidence demonstrates that he did not engage in any violence or attempt to incite any violence. (3) Nor is there any evidence that Mr. Vukich engaged in any acts of destruction.  The worst of his conduct while inside the Capitol appears to be that he picked up documents that were on the floor of a hallway and placed them inside his jacket, that he opened a hallway cabinet door and looked inside, and that he took a selfie showing other members of the mob in the background. His social media posts during his time inside the Capitol and immediately after were, at most, the boasts of a young man.  They did not call for violence or any other illegal act.  They did not even contain any support for the greater mob's apparent purpose. (4) He was certainly not supportive of the mob's acts of violence or destruction.  (5) There is no indication that he destroyed any evidence, other than discarding the papers he had picked up from the ground.  There is no evidence that he tried to delete anything from his phone. (6) Although Mr. Vukich and Mr. Perretta apparently traveled from the northwest end of the building to the southeast where they exited, they left as soon as a law enforcement official told them that they had to leave.  Most of the surveillance video that captured the two of them inside the building shows them wandering in the building by themselves, not doing anything that could be construed as violent or destructive or designed to thwart the certification of the Electoral College vote count.  (7) Nor do Mr.

Vukich's statements on social media support the violence that occurred or was occurring.  They do not even indicate any support for the greater mob's stated cause.  His posts seem to be consistent with his stated purpose of going to Washington that day – to see what was going to happen and to be at what he thought might be an historical event.  (8) When Mr. Vukich was visited by FBI agents less than four months after the Capitol insurrection, he spoke with them freely and without any request to discuss his situation with counsel.  He turned over his mobile phone, gave the agents consent to search it, and furnished them with his password.  (9) Lastly, Mr. Vukich may not have expressed his remorse to the FBI agents or on any social media posts prior to the surrender of his phone, but he has certainly done so to those who are close to him.  It is suggested that a consideration of the government's proffered factors alone would indicate that Mr. Vukich is at the low end of the spectrum for what punishment might be required.  Some of the January 6th defendants who have already been sentenced on the same charge to which Mr. Vukich has pled guilty have been sentenced to probation with some being placed on house arrest. To the extent that unwarranted sentencing disparities are to be avoided it is hard to conceive how someone who lies at the low end of the spectrum for just punishment should receive a greater punishment than others at the low end of the same spectrum or who are arguably further along on that spectrum.

The defense surely recognizes that general deterrence must be considered, but such deterrence occurs in many ways.  Those who have been charged even with misdemeanor offenses have faced national opprobrium.  Many have had difficulty finding employment in the wake of their arrests.  There are punishments beyond incarceration and those, when aired to the public at large, provide for deterrence beyond what incarceration achieves.  There is also the

consideration of how incarceration could have the unintended consequence of pushing Mr.

Vukich toward radicalization while in prison, if even for a relatively short period of time.

A full consideration of the nature and circumstances of Mr. Vukich's conduct, as opposed

to the conduct of the greater mob, and of his history and characteristics, the opinions of those

who know him well, and his remorse for his own conduct on January 6th and for what happened

that day would justly warrant a period of one day incarceration to be followed by supervised

release with significant community service to compensate for the damage done to the community

by his conduct, an appropriate fine, $500 restitution for the damage done to the Capitol is

sufficient, but not greater than necessary, to achieve just punishment, respect for the law, general

and specific deterrence, rehabilitation, and appropriate parity in sentencing.

Respectfully submitted,


*Mark Wilson*
MARK WILSON
Senior Trial Counsel
Federal Community Defender for the Eastern
District of Pennsylvania

**CERTIFICATE OF SERVICE**

I, Mark Wilson, Senior Trial Counsel, Assistant Federal Defender, Federal Community

Defender Office for the Eastern District of Pennsylvania, hereby certify that I have electronically

filed and served a copy of the attached Entry of Appearance via Electronic Case Filing ("ECF")

upon:


Jacob Strain
Assistant United States Attorney
United States Attorney's Office
111 South Main Street
Suite 1800
Salt Lake City, UT 84111


                                        /s/ Mark Wilson
                                        MARK WILSON
                                        Senior Trial Counsel


DATE:  December 23, 2021